IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| NATALIE CARLISLE,   ] | |
| ] | |
| Plaintiff,   ] | |
| ] | |
| v.   ] | CV-08-BE-2093-S |
| ] | |
| COMPASS BANK,   ] | |
| ] | |
| Defendant.   ] | |
| ] | |

**MEMORANDUM OPINION**

This employment-discrimination matter is before the court on Defendant Compass Bank's "Motion for Summary Judgment" (doc. 29). Defendant Compass Bank seeks judgment in its favor on Plaintiff's claims. Plaintiff Natalie Carlisle, a former employee of Compass Bank, alleges that Compass Bank subjected her to race and gender discrimination. Defendant Compass Bank has briefed its motion.[1] Compass Bank asserts that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law on Ms. Carlisle's claims. The court has considered the submissions and the applicable law. For the reasons stated below, the court will GRANT Defendant's motion for summary judgment. The court will simultaneously enter a separate order to that effect.

---

[1] The court struck Ms. Carlisle's brief in opposition to the motion because Plaintiff's counsel failed to file the brief in accordance with court-ordered deadlines. (doc. 44).

1

# FACTS[2]

Ms. Carlisle's Initial Employment with Compass Bank

Ms. Carlisle began her employment with Compass in 1995 and became a Mortgage Banking Officer ("MBO") in 1999. A MBO is a loan officer who processes loans through closing. As a MBO, Ms. Carlisle initially worked at the Trussville branch. Ms. Carlisle's total income for 1999 from Compass was approximately $30,000 in base salary and two thousand in commissions, for a total of $32,000. Ms. Carlisle does not recall what her income from Compass was in 2000, but she received approximately $60,000 total income in 2001 – $30,000 base salary and $30,000 in commissions.

Ms. Carlisle's Move to the UAB Branch

On or about early 2002, Ms. Carlisle's manager asked her to move out of the Trussville branch to the UAB branch in downtown Birmingham. Ms. Carlisle's manager informed her that she could make a lot of money at the new location. Ms. Carlisle initially resisted relocating from the Trussville branch because Trussville was a residential area and she had established client relationships at that location. Ms. Carlisle ultimately agreed to change her physical location to the UAB branch because of the opportunity to make more money.

Although Ms. Carlisle changed physical locations, she was still assigned as the MBO for the Trussville branch and other branches. According to Ms. Carlisle, no MBO had been located in the UAB branch before her. While located at the UAB branch, Ms. Carlisle received most of her loan production from branch referrals–customers who would "walk in the door" and

---

[2]The following facts are viewed in the light most favorable to the non-moving party, *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999), and are the facts only for summary judgment purposes.

customers who were referred to her by "word of mouth." As a MBO located at the UAB branch, Ms. Carlisle received referrals for and handled the overflow of Professional Association or "PA" loans in addition to all other loans. PA loans are offered to professionals such as attorneys, doctors and certified public accountants. PA loans tended to be higher dollar loans that resulted in more commissions for a MBO when compared to non-PA loans. According to Ms. Carlisle, the UAB branch had a higher level of PA loan referrals and walk-ins for Ms. Carlisle compared to other branches because of the UAB branch's proximity to professionals including doctors. Ms. Carlisle testified that in terms of commission, location "is everything" and that being downtown with close proximity to professionals such as doctors was of "utmost importance." In 2002, Ms. Carlisle received approximately $92,000 in combined base salary and commission while located at the UAB branch.

Refinance Boom In 2003

In 2003, an unusual "refinance boom" hit the residential loan market and affected Ms. Carlisle's income "greatly." Ms. Carlisle testified that it "was probably the best year ever in the industry." In 2003, Ms. Carlisle received approximately $194,000 in base salary and commission while located at the UAB branch. During the refinance boom, the opportunity and the pool of opportunity to close all types of loans were greater than normal. As the refinance boom ended, the opportunities were less and a MBO's production became more dependent on the ability to develop business.

Mr. Nola Becomes Ms. Carlisle's Supervisor

In the summer of 2003, Compass bank hired Patrick Nola as the Regional Sales Manager and he became Ms. Carlisle's supervisor. Mr. Nola was responsible for all sales activity and

production in Compass' mortgage division for Alabama and Florida. Mr. Nola supervised between twenty to thirty employees, including MBOs, between 2003 and 2007. As the Regional Sales Manager, Mr. Nola was not responsible for generating business or loans for each of the numerous MBOs; rather, he was responsible for managing MBOs, motivating them to obtain such business, and assisting them in their efforts. To assist the MBOs in their efforts to generate business, Mr. Nola held weekly sales meetings to identify strategic initiatives and discussed best practices and any obstacles that may exist.

At the request of a MBO, Mr. Nola would also participate with the MBO in joint sales calls to realtors or developers. Mr. Nola volunteered to do joint sales calls with Ms. Carlisle. Mr. Nola also performed joint sales calls with Jerry McCoy, another African-American MBO.

Ms. Carlisle's Move From UAB Branch to Valleydale Administrative Offices

Prior to the summer of 2004, Mr. Nola asked Ms. Carlisle to move to the new Valleydale administrative office space where Mr. Nola and other MBOs would be located. Ms. Carlisle informed Mr. Nola that she did not want to move out of the UAB branch because it was her "base" and the Valleydale office was located down Highway 280. Mr. Nola allowed Ms. Carlisle to stay at the UAB branch.

The Retail District Manager determines which departments at Compass receive space at the various branches. In the summer of 2004, Compass' Retail District Manager made the decision that the UAB branch no longer had enough space for a MBO to be located within it. Around July or August 2004 during a lunch meeting, Mr. Nola informed Ms. Carlisle that she had to move out of the UAB branch because the Retail District Manager wanted her to move out of the UAB branch to provide space for another department. Mr. Nola did not make the decision

to move Ms. Carlisle out of the UAB branch; rather, that decision was made solely by the Retail District Manager. In fact, Mr. Nola requested that the Retail District Manager allow Ms. Carlisle to remain at the UAB branch, but his request was denied. Although Ms. Carlisle physically moved from the UAB branch, Ms. Carlisle continued to be assigned to the UAB branch throughout her employment in addition to several other branches as well.

Ms. Carlisle's Decrease In Income After Refinance Boom and Move From UAB

After leaving the UAB branch, Ms. Carlisle testified that she was not receiving phone calls regarding loans as often as she did in the past years. In addition to MBOs such as Ms. Carlisle, Compass also employed PA MBOs (also referred to as PCMBOs or Private Client Mortgage Banking Officers), whose primary responsibility was to handle PA loans. Bob O'Reilly, National Sales Manager, decided that MBOs would no longer receive PA loan referrals for two reasons. First, PA MBOs were able to handle the loans because of the decreased number of such loans. Second, the compensation structure of PA MBOs influenced Mr. O'Reilly's decision. PA MBOs were paid a higher base salary and less percentage of commission compared to MBOs; therefore, Compass paid less in commission if a PA MBO closed a loan as compared to a MBO.

After the refinance boom was over and after Ms. Carlisle left the UAB branch, in each of the years 2004, 2005, and 2006, Ms. Carlisle made approximately $42,000 a year including base salary and commissions. Mr. Nola attributes Ms. Carlisle's decline in production from 2004 to 2007 to the fact that she stopped being "hand-fed" referrals from the PA department, the lack of overflow of PA loans, and the lack of demand for loans after the refinance boom.

Ms. Carlisle's Move From Valleydale Office

Ms. Carlisle was physically located at the Valleydale administrative offices for one to three months after she left the UAB branch. Ms. Carlisle requested to leave the Valleydale administrative office because she believed it was like "a frat house" with "a bunch of guys" and Highway 280 was "very congested." Ms. Carlisle requested and Mr. Nola allowed her to physically relocate to the Wildwood branch and she remained at the Wildwood branch for a year. Ms. Carlisle alleges that she did not receive any further PA loan referrals after relocating to the Wildwood branch and that someone, whom she does not know, referred the PA loans to a PA MBO.

Ms. Carlisle's Allegations Relating to Mr. Nola

Ms. Carlisle alleges that Mr. Nola stated to her that "we need to get more black business." Ms. Carlisle alleges that Mr. Nola at one time said that she had "an advantage being a black woman because [she] could get business they could not." Mr. Nola never told Ms. Carlisle not to solicit business from white customers. Mr. Nola never told Ms. Carlisle that she could not call on or obtain any type of business.

In August 2004, Mr. Nola referred a large loan of one of his friends (a white male) to Ms. Carlisle from which she received a commission. Mr. Nola could have referred this loan to any of the MBOs. Ms. Carlisle alleges that Mr. Nola told her that "we need to increase our CRA [Community Reinvestment Act[3]] production" and he encouraged her to focus on CRA loans.

---

[3]The Community Reinvestment Act is a law designed to encourage commercial banks and savings associations to meet the needs of borrowers in all segments of their communities, including low and moderate-income neighborhoods. Congress passed the Act in 1977 to reduce discriminatory credit practices against low-income neighborhoods.

However, Mr. Nola requested all MBOs, including white MBOs, obtain CRA loan business. Ms. Carlisle testified that Mr. Nola also stated that "the department" needs to do more CRA loans. Performing CRA loans would not have prevented Ms. Carlisle from handling other non-CRA loans, and Ms. Carlisle was not being asked to give up other loans.

Ms. Carlisle alleges that when an African-American MBO, Ken Crenshaw, left his MBO position, Mr. Nola requested that Ms. Carlisle and Jerry McCoy, an African-American MBO, come to Mr. Nola's office to discuss who were the African-American real estate agents with whom Crenshaw worked. MBOs have "pipeline" reports that list the loan applications for each MBO and other information regarding the loans in progress. When a MBO leaves his employment with Compass, Mr. Nola reassigns the loans contained in the departing MBO's pipeline to other MBOs based in part on geographical location and the MBO's low production. Ms. Carlisle and Mr. McCoy received the "pipeline" of loans that were formerly Ken Crenshaw's loans. Mr. Nola also gave Ms. Carlisle "pipeline" loans from at least two white departing MBOs as well.

Ms. Carlisle complained to Bob O'Reilly that she should have received all of the loans contained in Ken Crenshaw's pipeline because Ken Crenshaw wanted her to have all the loans. Ms. Carlisle further moved from the Wildwood branch to the Roebuck branch at her request to capitalize on the location where Ken Crenshaw had been located.

In the Spring of 2006, Ms. Carlisle was upset that Mr. Nola asked Ginger Pennington, a white female MBO from Tuscaloosa, to speak at a first-time homebuyers seminar in the Spring of 2006. Mr. Nola selected Pennington to speak because of her prior experience in making similar presentations in Tuscaloosa. Ms. Carlisle found it ironic that Mr. Nola asked

Pennington, who is white, to speak when the majority of the audience or participants were African-American.

Ms. Carlisle was offended about a document that Mr. Nola provided to MBOs entitled "Attitude," which stated as follows:

> Many years ago, a large American shoe manufacturer sent two of its salesmen to the isolated outback of Australia.  In a short time, the company received a telegram from each of the sales reps.  One said, "No business here.  Aborigines don't wear shoes."  The other said, "Great opportunity here!  Aborigines don't wear shoes!  THE TIME IS NOW!"

Mr. Nola provided this document to MBOs in an attempt to convey that one person may see an opportunity where another person may not.

About March or April of 2006 at a marketing event, Ms. Carlisle alleges that Mr. Nola stated that she had an attitude and while she was leaving, asked her, "What is wrong with you, do you need a man?"

Ms. Carlisle's Decision to Stay at Compass and Mr. Nola's Request that She Stay

In 2006, Ms. Carlisle explored opportunities with other employers, but did not actually apply for employment because she was not ready to leave Compass.  Ms. Carlisle was also offered employment at another company through her previous supervisor at Compass, but she did not accept such employment.  Ms. Carlisle does not recall any other specific Compass job that she bid on or applied for while working as a MBO at Compass.

In late December 2006, Ms. Carlisle contemplated leaving employment with Compass. Mr. Nola's secretary learned of her plans, and Mr. Nola told her that she "cannot leave" and that she was needed more than ever.  Ms. Carlisle did not resign at that time.

MBO Assignments to Subdivisions

At the time Ms. Carlisle agreed to stay with Compass, Mr. Nola informed Ms. Carlisle that Compass was the exclusive lender for a subdivision in Trussville called "Chatham Crest." Mr. Nola asked Ms. Carlisle and other MBOs to be present at the "Chatham Crest" subdivision on the weekends to obtain potential business. After not closing any loans from the subdivision, Ms. Carlisle requested to be removed from the project.

One MBO, Bob Hancock, initially obtained the business at a subdivision called "Sterling Glen" for Compass to be the exclusive lender. Ms. Carlisle alleged that Brad Hendrix was originally assigned the Sterling Glen subdivision because of "cronyism"–Mr. Hendrix' father was the head of Compass' construction lending group. Ms. Carlisle was not assigned to the Sterling Glen subdivision project because she had stated that she did not want to work weekends regarding the Chatham Crest subdivision. A white male MBO was not assigned the Sterling Glen subdivision for a similar reason. Jerry McCoy, an African-American MBO, was assigned to the Sterling Glen subdivision. Mr. Nola asked Ms. Carlisle to work on the Sterling Glen subdivision after other MBOs had problems. Mr. Nola informed Ms. Carlisle that she did not have to visit the subdivision on the weekends but to pop in and visit at times.

No Clear Connection Between Opportunities and Commissions

Ms. Carlisle agrees that just because she is provided an opportunity to obtain business, such as leads or exposure to business, it does not follow that she will actually close a loan and receive a commission. Likewise, Ms. Carlisle agrees that a denied opportunity such as a lead or exposure to business may not mean she has been denied commission.

<u>Ms. Carlisle's Complaint to Mr. Nola's Supervisor</u>

About January 2007, Ms. Carlisle spoke with Bob O'Reilly, National Sales Manager and Mr. Nola's supervisor, to complain about Mr. Nola. She told Mr. O'Reilly that Mr. Nola had treated her differently because she was black. She also told Mr. O'Reilly some of Mr. Nola's alleged statements. Ms. Carlisle informed Mr. O'Reilly that it was not her intent to get Mr. Nola into trouble but that she just wanted his conduct to stop. Mr. O'Reilly informed Mr. Nola that Ms. Carlisle was not happy with his management style and that Ms. Carlisle believed that he did not treat her fairly compared to other MBOs.

A few weeks following Ms. Carlisle's discussion with O'Reilly, Mr. Nola requested a meeting with Ms. Carlisle. Mr. Nola testified that his purpose in conducting the meeting with Ms. Carlisle was to let her know that he did value and respect her as an employee and he wanted her as a part of their team. Mr. Nola testified that he told her that he never intended to offend her in any way and he was "sorry" if he did and he would do his best to change her opinion of him. Ms. Carlisle alleges that during this meeting Mr. Nola stated in part that if "Bob lives in Riverchase, he cannot necessarily relate to a farmer in Oneonta." Ms. Carlisle also alleges that Mr. Nola also stated that "certain people like working with certain people."

In Mr. Nola's Annual Performance Evaluation dated January 24, 2007, in which he was rated "Superior," Mr. O'Reilly noted under "Areas To Improve" that Mr. O'Reilly and Mr. Nola had "discussed a need for [Mr. Nola's] greater sensitivity with several of [Mr. Nola's] direct reports." Mr. Nola believed that the reference referred in some part to Ms. Carlisle.

Ms. Carlisle could not recall any event that occurred after her meeting with Mr. Nola that offended her. However, she testified that Mr. Nola did not set up a lunch meeting with the agent

at the Sterling Glen subdivision to introduce Ms. Carlisle to her as he stated he would.

Events Immediately Prior to Ms. Carlisle's Resignation from Compass

In February 2007 at a Compass National Sales Mortgage meeting, MBOs informed Ms. Carlisle that Mr. Nola had arranged for a male stripper to perform for a MBO's birthday.  Ms. Carlisle's basis for believing that Mr. Nola had arranged for the male stripper was based solely on the alleged statements of other MBOs.  Mr. Nola, however, did not arrange for a male stripper.

In February 2007, Mr. Nola provided Ms. Carlisle with the opportunity to obtain a pipeline of loans totaling over $1 million from a departing MBO, but Ms. Carlisle turned down the opportunity.  Through a letter dated March 5, 2007, Ms. Carlisle resigned employment with Compass.  Ms. Carlisle testified in part as follows regarding the reasons she resigned employment with Compass:

> Q: …Why did you resign from Compass Bank?
> A: I felt that I was being mistreated and disrespected.  I had worked with the company for twelve years and it seemed not to matter.  And I was disappointed in how everything was handled.
> Q: And specifically, what was that?
> A: I believe they let Patrick run amuck.
> Q: …What events specifically led to your resignation that led you to believe that Patrick was let to run amuck?
> A: The stripper in Houston, that was it for me, that's it.  Nothing is going to be done, they are not taking me seriously.  I am out of here. …. Well, of course, it was a culmination of things.  This was just the icing on the cake, they didn't take me seriously.

Ms. Carlisle had obtained employment with a new employer before resigning employment with Compass.  Ms. Carlisle was later terminated from this employment and was not eligible for rehire because of her lack of loan production.

**STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In this case, for purposes of summary judgment, Ms. Carlisle has failed to submit any facts. Accordingly, she has not met her burden of demonstrating a genuine issue of material fact. Thus, the only issue left for the court to

determine is whether Compass Bank is entitled to judgment as a matter of law.

## DISCUSSION

Ms. Carlisle asserts that Compass Bank discriminated against her because of her gender and race during her employment as an MBO.  Specifically, Ms. Carlisle alleges that Compass Bank subjected her to (1) race discrimination under 42 U.S.C. § 1981 regarding the terms and conditions of her employment or compensation; (2) a racially hostile work environment under 42 U.S.C. § 1981; and (3) constructive discharge with respect to race and gender in violation of Title VII.  For the reasons stated below, Compass Bank is entitled to summary judgment on all of Ms. Carlisle's claims.

I.   Carlisle's Race Discrimination Claim Under 42 U.S.C. § 1981

Count One of Ms. Carlisle's amended complaint alleges a violation of 42 U.S.C. § 1981 for race discrimination regarding the terms and conditions of her employment.  Ms. Carlisle testified in her deposition that her terms and conditions claim is based on her decrease in compensation and the lack of a conducive work environment.  Compass Bank is entitled to judgment as a matter of law on Ms. Carlisle's terms and conditions claim because Ms. Carlisle's evidence fails to prove that she was subjected to adverse employment action–an essential element of her discrimination claim on which she bears the ultimate burden of proof.

Under the *McDonnell Douglas*[4] framework, to establish a prima facie case of race discrimination, a plaintiff must establish she was subjected to an adverse employment action. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Not all conduct by an employer negatively affecting an employee  constitutes an adverse employment action. *Davis v. Town of*

---

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

*Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). The impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. *Id.* at 1239. "The employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Ms. Carlisle's claim is based on her decrease in income after the refinance boom of 2003. Ms. Carlisle alleges that Compass Bank denied her opportunities to participate in certain functions or opportunities that affected her income. However, as Ms. Carlisle testified, the fact that a MBO is provided an opportunity to potentially obtain business does not mean that a MBO will actually close a loan and receive commission. Conversely, only speculation leads to the assumption that a denied opportunity or lead means denied commission.

In the case of *Brown v. Sybase, Inc.*, 287 F. Supp. 2d 1330 (S.D. Fla. 2003), the court concluded that the plaintiff's claim of unequal distribution of sales leads was not an adverse employment action. The court stated in part:

> Critically…there is no evidence in the record as to the extent of impact, if any, that a lack of sales leads might have on a regional sales manager's attainment of a pipeline and ability to make sales. … There is also no evidence that any of the leads, given to the other sales managers, which Brown contends were of a better quality, ever materialized into pipeline opportunities of sales. Based upon the record, therefore, the Court would have to speculate on the extent of the impact of Amstutz's failure to distribute to Brown quality sales leads. Since, the asserted impact of a challenged employment action cannot be speculative under the *McDonnell Douglas* framework, *see* [*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)], the Court concludes that Brown has not demonstrated that Amstutz's failure to provide Brown good sales leads was an "adverse employment action."

*Id.* at 1341.

Similarly, Ms. Carlisle has submitted no evidence that an alleged denied opportunity to

14

participate in a function or opportunity resulted in denied commission, or that similarly situated white MBOs actually made commission off of opportunities she was allegedly denied. Accordingly, Carlisle fails to meet an essential element of the claim and Compass Bank is entitled to judgment as a matter of law.

II.     Ms. Carlisle's 42 U.S.C. § 1981 Hostile Work Environment Claim

In Count Two of her amended complaint, Ms. Carlisle alleges a racially hostile work environment in violation of 42 U.S.C. § 1981. Under Section 1981, "a hostile work environment claim is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a hostile work environment claim, a plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275. Ms. Carlisle's hostile work environment claim cannot withstand Compass Bank's motion for summary judgment because she has failed to submit evidence of the third and fourth elements of a hostile work environment claim.

   A.     Ms. Carlisle has not produced evidence that the alleged harassment was based on race.

No matter how poorly Ms. Carlisle claims she was treated, her claim cannot succeed unless she can demonstrate that the alleged mistreatment was based on race. *See Laosebikan v. Coca-Cola*

*Co.*, 167 Fed. App'x 758, 765 (11th Cir. 2006) ("In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or pervasive requirement is met.") (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)). Ms. Carlisle has presented no evidence that the alleged harassment was based on race. In fact, the vast majority of Ms. Carlisle's allegations relating to Mr. Nola have nothing to do with race. Further, Ms. Carlisle's allegations that relate to race, such as Mr. Nola's alleged statement that Ms. Carlisle had an advantage being an African-American woman, do not evidence a harassing or negative attitude towards race.

      B.    Ms. Carlisle has not produced evidence of a severe or pervasive hostile working environment.

Ms. Carlisle's hostile work environment claim also fails because she has not presented evidence that the alleged racial harassment was sufficiently severe or pervasive. As noted above, not all harassment is actionable under Title VII or Section 1981. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 81 (1998); *Gupta*, 212 F.3d at 583. Title VII or Section 1981 is neither "a general civility code" nor "designed to purge the workplace of vulgarity." *Oncale*, 523 U.S. 75, 81 (1998).

In evaluating the objective severity of alleged harassment, courts consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Gupta*, 212 F.3d at 584 (citation omitted); *Clark County School District v. Breeden*, 532 U.S. 268, 270-71 (2001); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246-47 (11th Cir. 1999). As one court has noted in the context of sexual harassment, "[a]ll of the

sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999).

Ms. Carlisle's allegations do not even come close to establishing a severe or pervasive racially hostile working environment. Instead, she alleges isolated events and comments that are not objectively hostile or based on race. Ms. Carlisle has not provided sufficient evidence to establish the elements of a hostile work environment claim; therefore, her claim cannot withstand Defendant's motion for summary judgment.

### III.     Ms. Carlisle's Constructive Discharge Claim

To establish the theory of constructive discharge, a plaintiff must "demonstrate that working conditions are so intolerable that reasonable persons in their position would have felt compelled to resign" by producing "substantial evidence that conditions were intolerable." *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1302 (11th Cir. 2005) (emphasis added). Evidence of intolerable conditions must be so extreme that such evidence exceeds even that required to prove a hostile work environment. *See, e.g., Bryant v. Jones*, 575 F.3d 1281, 1298-99 (11th Cir. 2009) (establishing the theory of constructive discharge "is a more onerous task than establishing a hostile work environment claim."); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18 (11th Cir. 1989) (plaintiff did not prove a constructive discharge theory even though plaintiff could establish that he was subject to a hostile work environment).

In the present case, Ms. Carlisle cannot prove that Compass subjected her to a hostile work environment, much less that Compass subjected her to such intolerable conditions that she had no

choice but to resign. While Ms. Carlisle may claim that conditions were intolerable, her subjective interpretation is not dispositive of the issue. *See Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1363 (11th Cir. 1994) (recognizing that whether conditions are so intolerable to push someone to resign is determined from an *objective* viewpoint); *see also Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (same). Instead, from an objective viewpoint—which governs the constructive discharge analysis—no reasonable person could agree with her assessment. As discussed above, Ms. Carlisle alleges little that could even arguably be considered discriminatory. Further, the undisputed facts are that Mr. Nola encouraged Ms. Carlisle to stay at Compass in late December 2006 when she initially considered resigning. Moreover, many of Ms. Carlisle's reasons for resigning are related to issues for which she blamed Mr. Nola but in which he played no role. For example, the facts presented show that Mr. Nola did not orchestrate the male stripper who performed for another MBO. Ms. Carlisle's information to the contrary is based on unreliable hearsay.

  Considering the totality of the evidence, Ms. Carlisle has not carried her burden of proving by substantial evidence that Compass Bank essentially forced her to resign. As such, Ms. Carlisle cannot establish a constructive discharge claim.

**CONCLUSION**

For the reasons stated above, the court GRANTS Compass Bank's motion for summary judgment. The court will simultaneously enter a separate order to that effect.

DONE and ORDERED this 21st day of May, 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE